PYLE v. TEXAS TRANSPORT & TERMINAL CO. et al.

(District Court, E. D. Louisiana. December 28, 1911.)

No. 14,240.

1. BANKRUPTCY (§ 140*)—ESTATE OF BANKRUPTS—OWNERSHIP OF PROPERTY—SALE.

A bankrupt engaged in cotton exporting drew drafts to which forged bills of lading, invoices, and insurance certificates were attached, and caused them to be accepted and ultimately paid by the drawee, a foreign bank, according to the ordinary custom of business, by which the bankrupts would consign cotton to S. & Co. on negotiable bills of lading to their own order and annex such bills, properly indorsed, together with other documents usual to the cotton trade to drafts drawn on the various banks in Havre with whom S. & Co. had previously arranged for credit. The banks would accept and pay the drafts and hold the cotton as security for their reimbursement, and, when sold, would release the cotton to S. & Co. or the purchaser. Thereafter, and before bankruptcy, the bankrupt assembled cotton sufficient to satisfy the forged drafts, and consigned the same identically as represented by the forged bills and shipped the same to Havre, taking port bills of lading which were mailed to S. & Co., with instructions to deliver them to the bank in exchange for the false through bills of lading annexed to the drafts. Shortly after this was done, and before shipment, the bankrupts' trustee seized the cotton as a part of the bankrupts' estate. *Held*, that the cotton shipped became appropriated to the fulfillment of the prior transaction, and amounted to an absolute sale to the bank, and was therefore not an asset of the bankrupts.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

2. BANKRUPTCY (§ 166*)—PREFERENCE—EVIDENCE.

Such transaction was insufficient to warrant a finding that the bankrupts by so shipping the cotton intended to prefer the bank, or that the bank had any knowledge of an intended preference or of the bankrupts' insolvency; and hence the shipment was not voidable as a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

In Equity. Action by J. A. E. Pyle, as trustee in bankruptcy of Steele, Miller & Co., against the Texas Transport & Terminal Company and others. Judgment for defendant. Bank of Mulhouse, intervener.

See, also, 185 Fed. 309.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

W. A. Percy, J. A. Lamb, and Dufour & Dufour, for plaintiff.

Denegre & Blair, for defendant Bank of Mulhouse.

George H. Terriberry, for defendant Texas Transport & Terminal Co.

FOSTER, District Judge. [1] It appears that the firm of Steele, Miller & Co., domiciled at Corinth, Miss., were engaged in a large cotton exporting business, and in the course of their business drew nine drafts on the Bank of Mulhouse, aggregating about $66,000, and all in substantially the same form, of which the following is a fair sample:

"90 days after sight of this first of exchange (second unpaid) pay to the order of ourselves forty thousand two hundred and seventeen 90/100 francs. Value received and charge to account R. D. A. R. 1/100 bales cotton. To Banque de Mulhouse, Havre, France.      [Signed]   Steele, Miller & Co."

To these drafts were attached what purported to be nine railroad through bills of lading from points in Mississippi to Havre, France, each for 100 bales of cotton, shipped by Steele, Miller & Co. to their own order, with instructions to notify Scheuch & Co., and indorsed in blank, but which were in reality entirely forged and fictitious, and no cotton at all had been actually shipped. There were also attached to the drafts the usual invoices and insurance certificates. Steele, Miller & Co. discounted these drafts in the usual manner, and they were in due time accepted by the Bank of Mulhouse and ultimately paid. Thereafter, Steele, Miller & Co. assembled 900 bales of cotton at New Orleans, marked it, and consigned it identically as represented by the forged bills of lading, and shipped it to Havre by the Compagnie Générale Transatlantique, took for it port or custody bills of lading, and mailed them to Scheuch & Co., who were their agents, with instructions to deliver them to the bank in exchange for the false through bills of lading annexed to the drafts. Shortly after shipping the cotton, and before it had actually left the United States, Steele, Miller & Co. were adjudicated bankrupts and their trustee brought his bill of complaint against the Bank of Mulhouse, against Scheuch & Co., and against the Compagnie Générale Transatlantique and its agent at New Orleans, the Texas Transport & Terminal Company, in whose custody the cotton then was, to recover the said 900 bales of cotton, on the ground that the shipment constituted a voidable preference.

For reasons previously filed, a preliminary injunction issued, restraining the carrier from removing the cotton out of the jurisdiction of this court, but the bank was permitted to take over the cotton on bond. So, for the purposes of this decree, Scheuch & Co. and the carrier and its agent may be considered nominal parties.

It is contended by the bank that the transaction between it and Steele, Miller & Co. is in the nature of a sale, and that by marking the cotton and shipping it Steele, Miller & Co. appropriated it to the contract before bankruptcy, that Steele, Miller & Co. did not intend to create a preference, and that, even if they did, the bank did not know, and had no notice, constructive or actual, of the insolvency of Steele, Miller & Co. and an attempt to prefer it.

But the trustee contends that Steele, Miller & Co. substituted good collateral for documents of no value, and thereby created a voidable preference, which he is suing to set aside, and as trustee he is not estopped. I cannot agree with these contentions. The method of doing business which the parties had adopted was as follows: Steele, Miller & Co. would consign their cotton to Scheuch & Co. on negotiable bills of lading to their own order, and annex these bills, properly indorsed, together with other documents usual in the cotton trade, to drafts drawn on the various banks at Havre with whom Scheuch & Co. had previously arranged for credits. The banks would accept and ultimately pay these drafts, and hold the cotton as security for their reimbursement. Scheuch & Co. would sell futures against the cotton to protect the banks from market fluctuations, and in the usual course of business would dispose of the cotton after it arrived, and then reimburse the banks. The banks would then release the cotton to Scheuch & Co. or the purchaser. Under this arrangement, it seems to me that Steele, Miller & Co. parted with the ownership and control of the cotton the moment they shipped it and drew on the bank for its value. And it will be noted in this connection that the drafts are to be charged to account of the cotton, and not to the account of Steele, Miller & Co. Steele, Miller & Co. at times remitted funds to Scheuch & Co. in settlement of their mutual accounts, but these were to reimburse the banks for losses on the out-fall of the cotton, such as differences in grade or weight, for which they were, of course, liable, or to take up drafts that had been drawn in excess of their line of credit. I can see no difference in principle between these transactions and out and out sales.

When Steele, Miller & Co. had obtained the bank's money by falsely pretending they had shipped the cotton against which the draft was drawn, and on the faith of which purported shipment the bank had accepted and paid the draft, there is no reason why they could not afterwards appropriate the actual cotton to the contract, and by shipping it, consigned and marked precisely as represented in the forged bills of lading, they did so. The Idaho, 93 U. S. 575, 23 L. Ed. 978. It is immaterial that in this case they took out port, instead of through, bills of lading. It was immaterial what they might do with the genuine bills of lading, provided no rights of innocent third persons were affected. That they sent them to the bank to be substituted for the forged ones but strengthens the facts showing appropriation. It did not constitute a change of securities. Steele, Miller & Co. appropriated the cotton to the contract, and the transaction was entirely complete before bankruptcy. They would have been estopped to assert any claim to it, and the trustee is in no better position.

[2] While I do not consider the question of voidable preference is presented in this case, and prefer to rest my decision on the above reasons, perhaps it is but fair to the defendant to say that I am not convinced that Steele, Miller & Co. intended a preference, as it seems to me they uniformly discounted drafts purporting to be secured by bills of lading for cotton, which were in reality forged, and thereafter shipped the cotton to prevent discovery of their dishonest methods,

and that their transactions with the bank were in the usual course of business and without any intention on their part other than to conceal their true methods. Furthermore, while the facts on which they might be charged with notice ought to have excited the suspicion of the bank, I am not prepared to say that they had knowledge, constructive or actual, of Steele, Miller & Co.'s insolvency, or that a preference was intended. Tumlin v. Bryan, 165 Fed. 168, 91 C. C. A. 200.

There will be a decree in favor of the bank adjudging it to be the owner of the cotton and dismissing the bill as to it, but the bill will be retained for further proceedings on other branches of the case.